LOER *v.* NEAL ET AL.

[No. 18,764. Filed November 1, 1956. Rehearing denied December 14, 1956. Transfer denied March 11, 1957.]

*Gardner, Jessup, Harrington & Haworth,* of Richmond, *Franklyn George,* of New Castle, and *Hollowell & Hamill,* of Indianapolis, for appellant.

*Malcolm M. Edwards, Paul C. Archibald,* of New Castle, *James H. Ronald,* of Richmond and *Wesley Ratliff, Jr.,* of Knightstown, for appellees.

ROYSE, J.—Appellees Neal brought this action against appellant and appellee Kelly. Their amended complaint

against appellee Kelly was on the theory of actual legal fraud and misrepresentation in a trade between appellees and said appellee Kelly, in which appellees traded real estate to him for 180 shares of stock in Mudlavia Springs, Inc. As to appellant it was on the theory that he, acting as appellees' broker, breached his duty in that he and a salesman working out of his office failed to reveal to appellees Neal that appellee Kelly was working out of his office; that appellant failed to disclose to said appellees that he had formerly owned stock and had been an officer in said Corporation, all of which stock, except 50 shares, he had previously sold; that appellant informed said appellees such stock would represent an interest in a farm and failed to disclose said Corporation did not own said property, was not making a profit, and that said stock had no value. To this complaint appellant and appellee Kelly filed an answer of admission and denial under the rules.

The cause was tried to the court. The court found in favor of appellee Kelly against appellees Neal, and found in their favor against appellant, and that they were entitled to recover $18,000 in damages against appellant. Judgment accordingly.

It is conceded by the parties that no question is presented by this appeal as to the judgment in favor of appellee Kelly. (Hereinafter the term appellees shall refer to the Neals.)

The error assigned here is the overruling of appellant's motion for a new trial. We proceed to a consideration of the specifications of that motion not waived necessary to a determination of the questions presented.

Appellant first contends the evidence is not sufficient to sustain the decision of the court and is contrary to law.

While there is some conflict in the evidence, considering as we must only the evidence most favorable to

appellees and the reasonable inferences that may be drawn therefrom, it discloses the following facts.

Appellees are husband and wife. The husband quit school in the 4th grade and the wife when in the 5th grade. He had worked for some time as a hammerman in the Chrysler foundry at New Castle. For some time prior to September, 1950, appellees owned real estate at the west edge of the town of Straughn where they lived and operated a service station, restaurant and trailer camp. They had about eleven rooms to rent.

Appellant was a real estate agent in New Castle and operated under the name of "Loer and Associates, Realtors". Associated with appellant as salesmen were appellee Kelly and one Basil Vance.

Appellees, in the latter part of September, 1950, decided they wanted to sell or trade their property. They read an advertisement of appellant and contacted him in reference to a sale or trade of this property. After some negotiation between appellant and Vance appellees listed this property with appellant for $20,000. It was noted on the back of this agreement that appellees would trade for a house in New Castle or a farm. The listing price did not include the inventory and stock on hand.

About a week later appellant and Vance called on appellees and told them they had a place on 25th Street in New Castle that they might be interested in. Appellees told appellant and Vance they were not interested. Appellant then told them he had a farm up near Attica. The farm was over five hundred acres. Appellant produced a map showing the farm and sanitarium and hotel. He told appellees a man named Kelly who lived, owned and operated a theatre in Muncie, was the owner of this property. (Kelly at the time lived in New Castle and Loer knew this.) He said Kelly had been in partnership with a man named Rudhman and they could not get

along. He told them something about the stock which he (appellant) said had been sold to replace the hotel which had burned down. Appellant told appellees this stock was valued at $100 a share; that it was issued on a 5-year payment and if it run five years it would be worth $105 a share. He told them it would pay 6% interest and could go as high as 10%. At this meeting appellees arranged with appellant to meet Kelly the following Monday at appellant's office.

Pursuant to this arrangement they met at appellant's office and were introduced by him to Mr. Kelly. Kelly took them to the property. Enroute they discussed the farm and he showed them the boundary of the farm and showed them some cattle on the farm. Kelly told them the business did well even during the depression. Kelly introduced them to a Mr. Summers at the hotel and the four of them conferred in Summers' office for about a half hour. Summers, in answer to an inquiry of the husband, said the business was going just swell. Kelly told them the proceeds from the sale of grain, cattle, etc. went into the Corporation and that was what helped pay the interest on the money they had borrowed to rebuild the building. In answer to the husband's inquiry as to what his job was there, Summers told them he was more interested in the Springs, that he took care of that part of it and had an option on it. They subsequently learned that Summers was president of the Corporation. During this trip Kelly did not tell them he was a salesman out of appellant's office.

The next morning Vance called on appellees and offered them a proposition to trade the stock for their property and appellees pay $1000.00 commission. Appellees rejected this offer and said they would take the $18,000 if Kelly would pay the commission. Vance told them he would have to talk to Loer about that and left. Kelly agreed to pay the commission. Appellant got part

of this commission. The same day Kelly and appellees entered into a written agreement whereby Kelly purchased their property for $18,000 in Mudlavia Springs Corporation. The next morning appellant, Vance, Kelly and appellees met in appellant's office and closed the deal.

The record discloses that appellant admitted Kelly was a salesman out of his office at the time the foregoing transaction took place; that in this case Vance was his head salesman; that he (appellant) was one of the incorporators of Mudlavia Springs, Inc. He was Secretary-Treasurer of this Corporation from 1949 to June, 1950, when he sold his stock in the Corporation. During the time he owned this stock the corporation had not made a dollar. He did not inform appellees that he was a former stockholder and officer in this Corporation. At the time he sold his stock there was due on the conditional sales contract hereinafter referred to more than $171,000. The property at that time was valued at $95,000 to $100,000. The only asset of this Corporation was the ownership of all the stock of the Hotel and Sanitarium Corporation. Mudlavia did not own or have any interest in the farm property.

The Hotel and Sanitarium Corporation owned an equitable interest in a conditional sales contract to purchase the farm property which at this time was owned by the Ball Estate. The latter Corporation was obligated to pay $1,000 a month on this contract. At the time appellant sold his stock in Mudlavia he knew the Hotel Corporation was delinquent in its payments on the conditional sales contract. Finally, in 1953 the Ball Estate took over this property because of failure of the Hotel Corporation to make the payments due. Appellees' stock is worthless.

Appellant contends the foregoing facts are insufficient to sustain the finding of the court and therefore the

decision is contrary to law. He contends that at least from the time appellees and Kelly met in his office and went to visit the property in Attica they made their own negotiations and he took no part in the transaction thereafter until the agreement was signed; that he was not acting as the agent of appellees but merely supervised the mechanics of closing the transaction. For the reasons hereinafter stated we cannot agree with this contention.

Among numerous authorities cited by appellant on this question he quotes from the case of *Johnson, Insurance Commissioner* v. *Schrepferman* (1917), 67 Ind. App. 606, 609, 610, 119 N. E. 494, as follows:

> "A broker is a negotiator between other parties, and does not act in his own name. The character of his relation to a given transaction, when not admitted, may be proved like any other fact, by either direct and positive evidence, or may be inferred from proved facts and circumstances which warrant such inference."

We agree with that statement of the law and believe the decision in that case does not sustain appellant's position here.

In 8 Am. Jur. (Brokers), p. 1038, §89, it is stated:

> "The rule requiring a broker to act with the utmost good faith towards his principal places him under a legal obligation to make a full, fair and prompt disclosure to his employer of all facts within his knowledge which are or may be material to the matter in connection with which he is employed, which might affect his principal's rights and interests or influence his action in relation to the subject matter of the employment, or which in any way pertain to the discharge of the agency which the broker has undertaken."

See also 8 Am. Jur., *supra,* pp. 1035-1037, §§85-87.

Our own Supreme Court is committed to this rule in

the case of *Mason Produce Company* v. *Harry C. Gilbert Company* (1924), 194 Ind. 462, 468, 141 N. E. 613. The court, speaking through Judge Ewbank, said:

"A broker owes to his principal the duty to act with the utmost good faith in all their dealings with each other, and is under the legal obligation to disclose to a person by whom he is employed as broker all facts within his knowledge or which he may learn in the course of a transaction in behalf of such person that are or may be material to the matter in which he is employed, or which might influence the action of his principal in relation thereto."

In 37 C. J. S., p. 245, §16-a, it is said:

"Where the law imposes a duty on one party to disclose all material facts known to him and not known to the other, *silence or concealment in violation of this duty with intent to deceive will amount to fraud as being a deliberate suppression of the truth and equivalent to the assertion of a falsehood.* . . . Whether a duty to speak exists in a given case is a question depending on the peculiar facts involved." (Our emphasis).

To the same effect see also: *Allen Realty Company* v. *Uhler* (1925), 83 Ind. App. 103, 107, 146 N. E. 766; *Smith* v. *Fiscus* (1916), 62 Ind. App. 156, 111 N. E. 203 (Transfer denied) ; *Duguid et al.* v. *Coldsnow* (1921), 76 Ind. App. 545, 549, 132 N. E. 659. In the last cited case this court said:

"The numerous decisions of the Courts condemning property transactions with the unwary, should be a warning to those who are schooled in the art of trading, that they must deal with frankness and integrity and this is especially mandatory when the deal is with those whose training has not been along commercial lines."

In our opinion the evidence does not show that appellees and Kelly completed their negotiations without the

active aid of appellant. However, assuming for the sake of the argument that Loer's efforts did bring the Neals and Kelly together and that they did negotiate and bargain, this was part of appellant's duties as a broker and agent. His failure to disclose information and his fraudulent concealment of facts which would have influenced his principals was what caused the appellees' damage.

Appellant knew and testified that the only asset of Mudlavia Springs, Inc. was its stock in the Hotel and Sanitarium Corporation; that the only asset of the Hotel and Sanitarium Corporation was its equity, if any, under the Ball contract; that the only income Mudlavia Springs, Inc. had was from dividends on its Hotel and Sanitarium Corporation stock; that Kelly had no interest in the farm; that Kelly's Class A stock was only a debt of Mudlavia Springs, Inc. to be paid by the Corporation; that the Corporation made no money while he owned his stock and had paid no dividends; that with no dividends the Class A stock of Mudlavia Springs, Inc. could not be retired; that the business had to be profitable enough to pay installments on the contract and keep it alive and eventually pay dividends to Mudlavia Springs, Inc. to retire the preferred stock debt before anyone could make any money; that the farm was not the basis of value of the Class A stock; that he had sold his common stock four months previously because the Corporation couldn't make any money under the management and that he received no cash for his stock when he sold but only a note and it was not paid.

Appellant also knew and testified that Kelly was working as a salesman out of his office in September and October of 1950 and that in October, 1950 Kelly lived in New Castle on New York Avenue. He told the Neals his prospect by the name of Kelly owned and operated a theater in Muncie. He told the

Neals the stock represented an interest in the farm. He testified on his conditional examination that he never told them that Kelly was a salesman out of his office. On his conditional examination Loer refused to answer, on advice of his attorney, as to whether or not he told the Neals he had been an officer in the Corporation. Loer, as Secretary of Mudlavia Springs, Inc. from October, 1949, to June 1, 1950, was familiar with the books and records.

We believe the evidence was amply sufficient to sustain the decision of the trial court and the decision is not contrary to law.

Appellant next contends the trial court erred in not sustaining his motion for a new trial on the grounds of newly discovered evidence material to him which he could not with reasonable diligence have discovered and produced at the trial of this cause.

One of the items of evidence referred to under this specification of the motion for a new trial is predicated on the testimony of O. E. Dickerson. The affidavit of said Dickerson filed with said motion avers, in substance, that Dickerson during the year 1950, prior thereto and since, operated an insurance agency in New Castle and prepared Federal and State income tax returns for customers, two of whom were the appellees in this case. Sometime during October, 1950, said appellees came to his office and told him they were thinking of trading their real estate in the Town of Straughn for stock in Mudlavia Springs, Inc., which was owned by Mr. Kelly, and asked affiant if he knew anything about the stock and its value. The affiant told them that he did not, but would try to find out everything he could; that said appellees told him that the stock was in Mudlavia Springs, Inc., which operated a sanitarium at Kramer, Indiana, and that they were going up within a day or two to look over the place and wanted to find out about

the stock before they went to the sanitarium, if possible to do so. Affiant then called the office of the Secretary of State to obtain the available data from their files and the names of the directors and officers. Upon receiving this information he orally communicated it to the Neals. At the same time affiant telephoned an unnamed New Castle business man, banker, and financier, and was told by him that the stock was highly speculative and that he did not recommend its purchase. Affiant immediately orally communicated this conversation to said appellees who said they intended to go to the sanitarium to make further investigation anyway.

Affiant further stated that after said appellees made their trip to the hotel and sanitarium they again came to his office and told him that they had made the trade with Kelly; that they had talked to the officers and management at the sanitarium and decided there was money to be made at the sanitarium and that they had decided to take the risk on the stock; that they brought with them a certificate of stock for 180 shares in Mudlacia Springs, Inc. and left the same with him for safekeeping and reference in preparation of their 1950 Federal income tax return reflecting said exchange.

Affiant further says that he had never disclosed this information to Mr. Loer, Mr. Kelly, or anyone on their behalf for the reason he was not interested in the controversy nor aware of its nature, but that upon reading in a local newspaper the nature of the legal questions involved and the result of the trial, he in a casual conversation with unnamed third persons after the trial of this case, concerning the newspaper account, said that at one time the Neals asked him to make inquiry for them of said stock and its value.

Appellant in his affidavits avers, in substance, that he did not know and had no way of knowing that said Dickerson had represented the appellees in preparing their

tax returns or in any other capacity; that he only learned of the relationship through said casual remark made by Dickerson after the trial of said cause that said appellees had at one time asked him to make inquiry for them concerning stock in Mudlavia Springs, Inc. and its value, which remark of Dickerson was relayed by an unnamed person overhearing the same to appellant who then made inquiry of said Dickerson of his knowledge of said matters and learned the matters above set forth in Dickerson's affidavit.

Appellees, in their counter-affidavit, aver, in substance, that Dickerson was taking care of their books and taxes relative to their operation of the filling station; that some few days after October 17, 1950, the date on which they closed the deal for this stock, they took their figures to Dickerson for the month of October and up to the time of the sale to Kelly, and at that time told him of their trade so that he would have the information for their 1950 income tax report, at which time Dickerson said he wanted to see the stock certificate and he would check on the stock; that at no time prior to the closing of the transaction did they talk with Dickerson about making this trade; that in the month of November, 1950, they went back to see Mr. Dickerson and he said he had called the State House and the stock was listed but at no time did he ever say anything else about the stock valuation or of his having talked to his financial advisor or anyone else. They further averred that they were informed Dickerson was an employee of appellant in 1950, kept his books, made his tax returns, and still is so employed.

The second item of evidence referred to under this specification was the testimony of M. Ray Summers. Appellant's attorney, in an affidavit in support thereof, averred, in substance, that after appellant had, on February 20, 1955, located said

Summers in Tampa, Fla., he, on February 23, 1955, called said Summers by long distance telephone and had a lengthy conversation with him in reference to a conversation Summers had with appellees in October, 1950.

He further averred Summers told him in this conversation that he was President of the Corporation in 1950; that appellees and Kelly came to the hotel to inquire about the stock; that he, Summers, told them the stock was not listed; that the stock was speculative and if they could not afford to be without the use of their money or could not afford to take a chance of losing their money they should not buy the stock; that he told them any dividends had to come from the Hotel Corporation's operation and management of the hotel, sanitarium and farm; that neither corporation had any control over the Mineral Springs or real estate; that he told them the stock in Mudlavia Springs, Inc. had a future potential; that they were making a profit but that all net profits were being used to improve the properties; that appellees told them that in view of the price they were receiving for their property they could afford to take a chance; that he, Summers, from the 20th day of November, 1954, until the 15th day of January, 1955, was on a trip through the States of Arizona and California and had no forwarding address.

Affiant further said Summers agreed to sign an affidavit giving these facts if sent to him at Tampa, Fla.; that on the 24th day of February, 1955, he prepared such affidavit and mailed it to Summers; that on February 28, 1955 Summers returned said affidavit by mail saying he had been advised to "pass up" the signing of the affidavit but that in the event of a new trial he would give his testimony in person or by deposition; that on advice of this affiant appellant flew to Tampa in an effort to procure the execution of said affidavit but was unsuccessful.

Appellees filed their counter-affidavits denying specifically the statements that appellant's attorney averred were made by Summers.

Appellees also filed the counter-affidavit of Howard Brotherson which, in substance, averred he had known M. Ray Summers for the past several years; that from April, 1954 to September 23, 1954 said Summers lived in affiant's house at 1712 E. Wayne Street, South Bend, Indiana; that for approximately two months after that he lived in the Mishawaka Hotel in the City of Mishawaka, Indiana; that prior to April, 1954, Summers lived in Montmorenci, Indiana.

Appellees' attorney, Malcolm Edwards, filed his counter-affidavit which, in substance, avers that because of the testimony of appellees and appellee Kelly in the presence of appellant on February 23, 1954 given at the time of the taking of their conditional examination to the effect that appellees had talked with Summers during their visit to Mudlavia Springs, affiant wanted to locate said Summers with the view of possibly taking his deposition. On August 18, 1954 affiant made a trip to Williamsport and within not more than twenty minutes had information that if said Summers did not live in Montmorenci his whereabouts could be learned by going to said Montmorenci; that he learned that Summers then lived at 1712 E. Wayne Street, South Bend, Indiana. He verified this information but did not pursue the matter of arranging for the deposition of Summers because it could not be taken at Williamsport, Indiana at the time most of the conditional examinations were to be taken; that it took not to exceed two and one-half hours to locate the whereabouts of said Summers.

In support of his contention on this question appellant relies solely on the case of *Estes* v. *Anderson Oil Company et al.* (1931), 93 Ind. App. 365, 176 N. E. 560. We do not believe that case is applicable to the facts on

that question in this case. In that case the newly discovered evidence only came to light at the trial and was not cumulative. In this case appellee Kelly testified that the husband told him on the return trip from the Springs that Summers told him (the husband) the stock was speculative and the witness Kelly told the husband "Yes, it is; that is the kind I have".

In *Bartley* v. *Chicago and Eastern Illinois Railway Company et al.* (1942), 220 Ind. 354, 41 N. E. 2d 805, in referring to the specification of the motion for a new trial on the ground of new evidence, the Supreme Court said:

"The evidence in question, as disclosed by the affidavits filed with the motion, was a book entitled 'Charter and Ordinances of the City of Evansville' published in 1901. Assuming without deciding that this book would have sufficiently proved the existence of the ordinance, we cannot say that the court erred in denying the motion for new trial on account of its discovery.

"It is well settled that applications for a new trial on the ground of newly discovered evidence are looked upon with disfavor. Not only must diligence preceding the trial be shown but the evidence must be of such a character as to raise a reasonable presumption that a different result will be reached if it is introduced in the new trial. Granting such a motion is within the sound discretion of the trial court whose ruling will not be disturbed except for abuse of such discretion. (Citing authorities).

"This action has been pending since November 17, 1933. The opinion in the first appeal filed December 22, 1939, put appellant upon notice that he must be prepared to prove by competent evidence the existence and publication of any penal ordinance upon which he relied. The second trial was concluded on the 20th day of June, 1940. On the next day appellant's attorney in a casual conversation with a librarian in New Harmony learned of the possible existence of this book in one of the libraries in Evansville. It does not appear that the book had not been in the library all of the years the

case was pending. The affidavits disclose that appellant's attorneys had visited at least one of the libraries to examine newspaper files for proof of publication of the ordinance. We think it not unlikely that the trial court, in spite of their protestations of diligence, may have concluded that appellant and his attorneys could with reasonable diligence have discovered the book before the trial."

In the case of *Morrison* v. *Carey et al.* (1891), 129 Ind. 277, 278, 279, 280, 28 N. E. 697, the Supreme Court said:

"It is the well settled rule that applications of the kind now before us are regarded by the courts with disfavor. It is said: 'Motions of this kind ought to be received with great caution, because there are few cases tried in which something new may not be hunted up, and because it tends very much to the introduction of perjury, to admit new evidence after the party has lost the verdict, has had an opportunity of discovering the points both of his adversary's strength and his own weakness. . . . It is infinitely better that a single person should suffer mischief than that every man should have it in his power, by keeping back part of his evidence and then swearing it was mislaid, to destroy verdicts and introduce new trials at their pleasure.' *Moore* v. *Philadelphia Bank,* 5 S. & R. 41; *Baker* v. *Joseph,* 16 Cal. 173.

. . .

"The law favors the diligent, and punishes the negligent. . . . The diligence used must be fully set forth in the application. If it consisted in making inquiries, the time, place and circumstances must be stated, to the end that the court may know that such inquiries were made in the proper quarter, and in due season. *It is not sufficient to state generally that he had been diligent in making inquiries of those whom he supposed likely to know anything of the case; all the facts constituting the diligence must be shown.*

"The newly discovered evidence must be of a very material and decisive character. It must not be cumulative, and should be such as to render it reasonably certain that another trial would bring

about a different result. *Ward* v. *Voris,* 117 Ind. 368; *Hines* v. *Driver,* 100 Ind. 315; *Pemberton* v. *Johnson,* 113 Ind. 538." (Our emphasis.)

The Dickerson affidavit is too vague, fails to set forth the names of Dickerson's financial adviser to whom Dickerson made inquiries, does not set forth the name of the third person to whom Dickerson talked after learning of the verdict and who conveyed the Dickerson information to Loer. The affidavit of Tom Loer also fails to name the person who conveyed Dickerson's conversation to him. Such facts would have to be set out to make the application good.

In our opinion this so-called new evidence was merely cumulative. As heretofore shown, appellee Kelly said appellees admitted they had been informed by Summers the stock was speculative and Kelly said it was. This indicates to us the Dickerson evidence would not have changed the results. Appellant was under an absolute duty to disclose all facts that were known to him that were material and might have influenced appellees. Finally, Dickerson did not, by affidavit, contradict the counter-affidavit of appellees that they never discussed this transaction with him until after the deal was finally closed. Nor did he deny that he had been in the employ of appellant from 1950 until after the trial of this case.

In our opinion the failure of appellant to procure the affidavit of M. Ray Summers justified the trial court's action on this question. *Gardner* v. *State ex rel. Stottler* (1883), 94 Ind. 489. Furthermore, the counter-affidavits of appellees and their attorney show appellant did not use that degree of diligence necessary in matters of this kind.

Finally, appellant relies on Specifications Nos. 3 and 4 of his motion for a new trial, viz. the damages are excessive; error in assessment of the amount of recovery which is too large.

Appellant contends whatever loss appellees sustained would be the fair market value of the real estate which they gave by conveyance to appellee Kelly, less the incumberance thereon. Appellant cites a number of authorities in support of this contention, but an analysis of those cases discloses they are not pertinent to the questions before us in this case.

The case of *Nysewander* v. *Lowman* (1890), 124 Ind. 584, 24 N. E. 355, involved the trade of stock for real estate and appellee charged the President of the Corporation had misrepresented the value of the stock. In affirming the judgment the Supreme Court, speaking through Judge Elliott, said:

> "The measure of damages in such a case as this is the difference between the actual value of the corporate stock and *its value had the facts been as represented by the defendant. Booher* v. *Goldsborough,* 44 Ind. 490; *Morse* v. *Hutchins,* 102 Mass. 439; *Stiles* v. *White,* 11 Met. 356; *Noyes* v. *Blodgett,* 58 N. H. 502." (Our emphasis.)

> In *Valdenaire et al.* v. *Henry et al.* (1918), 70 Ind. App. 68, 121 N. E. 550, speaking on the measure of damages, the court said:

> "Under this assignment of error, the appellants complain that during the trial the court erred in refusing to permit appellants, for the purpose of establishing the measure of damages, if any, that were due appellees, to show the value of the real estate conveyed by appellees to appellants in exchange for the conveyance of the California farm, or ranch, alleged fraudulent representations as to the value of which is the basis of this action. While there are some cases that seem to support appellant's contention (see 20 Cyc. 130-132, and cases cited; 14 Am. and Eng. Ency. Law 182, and cases cited), certainly, the great weight of authority in Indiana, as well as elsewhere, makes the measure of damages not the difference in value between the properties exchanged, but the difference between the actual value of the property deeded by appel-

lants to appellees, at the time of exchange, and what it would have been worth had it been as represented, or what its value was represented to be. In support of their contention, appellants cite *Johnson, Admr.* v. *Culver, Admr.* (1888), 116 Ind. 278, 19 N. E. 129, but we think that a fair construction of this case on this question does not help them. The measure of damages, in so far as it involved the question in this case, was not considered and the method of proof, so far as the case discloses, seems to have been conceded by both parties, and adopted by the court without objection. The construction that the appellants would have us give the case is not in harmony with other decisions in this state. *Nysewander* v. *Lowman* (1890), 124 Ind. 584, 24 N. E. 355; *Brier* v. *Mankey* (1911), 47 Ind. App. 7, 93 N. E. 672; *Smith* v. *Hunt* (1912), 50 Ind. App. 592, 98 N. E. 841. We quote from page 602 of the last cited case as follows: *'The measure of damages in such a case is the difference between the value of the goods as they actually were, and their value had they been as represented. The measure of damages is not the difference between the value of the goods and the consideration exchanged for them.'* " (Our emphasis).

In the case of *Mowes* v. *Robbins* (1918), 68 Ind. App. 82, 85, 120 N. E. 51, this court said:

"In this state, and generally, the rule for the measure of damages for fraud in the sale or exchange of property is the difference in the actual value of the property received by the party alleged to have been defrauded and the value of such property at the time, had it been as represented to be by the vendor.

"The law presumes that the purchaser has paid for the property as represented, and that he is entitled to his bargain, if it be a bargain, and in the absence of fraud must abide by the result, though he may have paid more for the property obtained than it was worth."

In *Mason Produce Co.* v. *Harry G. Gilbert Company, supra,* the Court said:

"The amount of loss sustained by appellant of which appellee's negligence was the proximate cause was not agreed upon, but must depend, in part, upon inferences to be drawn from the facts proved. Drawing such inferences is a function of the jury or of the trial judge sitting as a jury, and not of an appellate tribunal."

We believe the trial court correctly applied the foregoing rule in this case. It is unquestionable that appellant knew the true facts regarding the Mudlavia stock. It is undenied that he did not disclose these facts and his past association with this corporation to appellees. He did not tell them that appellee Kelly was one of his salesmen. The amount of damages are not excessive or too large.

On the whole record before us we believe a fair and just result was reached in this case.

Judgment affirmed.

Kelly, J., not participating.

NOTE.—Reported in 137 N. E. 2d 728.

Transfer denied, Arterburn, J. dissents (without opinion.)